495 A.2d 1385

**Regina G. FRENCHAK, Formerly Regina G. Garing, Appellant,**

v.

**SUNBEAM COAL CORPORATION.**

Superior Court of Pennsylvania.

Argued Aug. 6, 1984.

Filed July 19, 1985.

38

Darrell L. Kadunce, Butler, for appellant.

Leo M. Stepanian, Butler, for appellee.

Before BROSKY, WATKINS and HESTER, JJ.

BROSKY, Judge:

This appeal is from judgment on the pleadings in an action to quiet title. Appellant contends that the instant coal lease is no longer in effect. We agree and, accordingly, reverse.

The lease provision in question provides that:

This lease shall continue for a period of five (5) years from the effective date hereof or until all of the coal which the coal operator determines can be mined, removed and sold with economy and profit has been or so long as minimum advance royalties are being tendered by the Coal Operator.

The court below interpreted this clause to mean that appellee could continue to have the lease in effect indefinitely into the future by virtue of paying minimum advance royalties. Indeed, the instant lease has been in effect for ten years and no coal has ever been mined. We cannot accept this contruction of the lease.

The lease provides for termination upon the happening of three events: (1) Passage of five years; (2) Determination by the coal operator that no more coal can be mined, removed, and sold profitably; (3) Cessation of payment of

minimum advance royalties by the coal operator. By providing, however, for termination upon the happening of (1) "*or*" (2) "*or*" (3), the lease must be interpreted as meaning that it shall terminate upon the happening of any one of the three conditions.

■ Words are to be given their obvious and plain meaning unless the intention is clear that a different meaning is required. *Davis v. City of Philadelphia*, 153 Pa.Super. 645, 650, 35 A.2d 77, 80 (1943). The pertinent dictionary definition of "or" is "choice between alternative things, states, or courses." Webster's Unabridged Third New International Dictionary.

In *Davis*, the appellant argued that the word "or" in a statute should be interpreted in the conjunctive in the phrase "occupied by ... or under his control," making both control and occupancy necessary. The court held otherwise, giving the word "or" its ordinary disjunctive meaning. The same reasoning applies in the case before us. To find otherwise would require interpreting the lease in a manner which would require absurd and unconscionable results in different factual situations. For example, construing the lease as continuing in effect until all three of the conditions have been met (as the lower court evidently construed it in order to reach the result it reached), a coal operator might never pay any royalty, yet the lease would continue in effect until at least five years had passed *and* the coal operator had made a determination that coal could no longer be mined, removed and sold profitably—a determination that might never be made by the coal operator. Another example would be if the coal operator made the determination that coal could no longer be mined, removed and sold profitably at the end of six months, and also quit paying the royalties; under the lower court's construction, the lease would nevertheless remain in effect for the balance of the five years.

■ Giving the word "or" its ordinary meaning, we find that the lease provides for termination upon the happening

of any one of the three conditions. Since five years have passed since the effective date of the agreement, the lease is no longer in effect, and the action to quiet title should have terminated in appellant's favor.

 Another, independent, consideration leads to the same conclusion. Under the lease as interpreted by the trial court, appellee could commence strip mining operations at his discretion as long as he had paid the minimum advance royalties. As a consequence, appellant would be financially unable to use the land for anything but certain types of agricultural purposes. The land could only be utilized as fields to grow crops. Even this limited use could not include irrigation or the planting of delayed harvest crops such as orchards, vines, etc. The reason for this is clear. Any investment in the use or development of the land—including buildings, irrigation systems, trees—could be scooped up by appellee's giant coal shovel at any time. With this possibility always present, appellant could not develop his land or utilize it in any but a very limited fashion. This position is not favored in law. "It is against the policy of the law to unduly restrict the use of land so that the owner is deprived of the usual rights, privileges, and incidents of ownership and possession." *Mahrt v. First Church of Christ, Scientist,* 142 N.E.2d 567, 578, 75 O.L.A. 5, 19 (1955).

The Supreme Court of Oregon has also spoken on this point: "[B]ut the rule is that, because of the public policy favoring untrammeled land use, such restrictions are construed most strongly against the covenant and will not be enlarged by construction." *Aldridge et ux. v. Saxey et ux.,* 242 Or. 238, 242, 409 P.2d 184, 186 (1965). Construing the lease as appellee would have us do results in this severely circumscribed useability of the land. Thus, for this additional reason, we find the lease properly interpreted as appellant suggests. A third related reason also favors this interpretation.

42

■ Under certain circumstances, the law will imply a duty to mine, even in the face of minimum advance royalties.[1] In Pennsylvania law, a presumption is created by this form of contract.

> When this contract was entered into, the defendants were the owners of the coal under seventy-five acres of land; the coal was in place; they wanted to get and enjoy the value of it; if plaintiff had wanted to buy and indefinitely leave it in place for future operation, each party would have dealt on the basis of a lump sum for the coal under the tract, or at so much per acre for it, and would have arranged for payment, just as they would have done if the subject of the contract had been land. Each might, as preliminary to the contract, have sought by surveys to ascertain the proximate quantity in place, and thus have fixed in their judgment the value, but the number of tons and value per ton would have been no express part of the written contract; a round sum for the whole or per acre would have represented the price the sellers were willing to accept and the buyers to give. But although the contract was a sale of the coal in place, they did not bargain on the basis of a lump sum. Why? Because the plaintiff was not a purchaser of coal or coal lands to hold for appreciation in price, in view of a future sale for a round sum or a lease to others at a profit; it was an operator who desired to mine and market the coal at a profit, intending to operate immediately; therefore, as in all such operations, it is more convenient to pay while the operation is going on, for it involves an expenditure of far less capital, consequently a less fixed charge.

*The Lehigh & Wilkes-Barre Coal Co. v. Wright et al.*, 177 Pa. 387, 397–8, 35 A. 919, 921 (1896). See also *Powell v. Burroughs*, 54 Pa. 329 (1867).

This implied duty to mine is dependent upon the amount of the minimum advance royalty vis-a-vis the potential in-

---

**1.** The case of *Chauvenet v. Person*, 217 Pa. 464, 66 A. 855 (1907), relied upon by both parties, is not on point. The lease in that case contained a forfeiture clause which, not surprisingly, is not present here.

come to be produced if the property is mined.[2] The logic behind this is that a substantial minimum advance royalty will evince the intent of the parties to consider that royalty an alternate form of performance. A minimal minimum advance royalty will, to the contrary, evince the intent of the parties to consider that royalty a temporary, stop-gap measure. See *Reis v. Norton Coal Co.*, 346 S.W.2d 8 (Ky.Crt.App.1961); *Weatherly v. American Agricultural Chemical Co.*, 16 Tenn.App. 613, 65 S.W.2d 592 (1933); *In re Sixteen to One Mining Corp.*, 9 B.R. 636 (U.S. Bankruptcy Crt.D. of Nev.1981); *Niles Land Co. v. Chemung Iron Co.*, 234 F. 294 (8th Cir.1916); *Vitro Mineral Corp. v. Shoni Uranium Corp.*, 386 P.2d 938 (Wyo.1963) (substantial minimum advance royalties). *Bennett v. Hebener*, 56 Or.App. 770, 643 P.2d 393 (1982); *Killebrew v. Murray*, 151 Ky. 345, 151 S.W. 662 (1912) (minimal minimum advance royalties).

Two passages dealing with minimum advance royalties are worth quoting for their explanation of the law.

Generally, all leases of land for the exploration and development of minerals are executed by the lessor in the hope and upon the condition, either express or implied, that the land shall be developed for minerals; and it would be unjust and unreasonable, and contravene the nature and spirit of the lease, to allow the lessee to continue to hold under it any considerable length of time without making any effort at all to develop it according to the express or implied purpose of the lease; and, in general, while equity abhors a forfeiture, yet, when such a forfeiture works equity, and is essential to public and private interests in the development of minerals in land, the landowner, as well as the public, will be protected

---

**2.** This duty has been found in oil and gas leases as well as other types of mining situations. *Richfield Oil Corp. v. Bloomfield,* 103 Cal. App.2d 589, 229 P.2d 838 (1951); *Spaulding v. Porter,* 94 Colo. 496, 31 P.2d 711 (1934). However, because oil and gas can be extracted from another site, there is a particular time value in extracting that sort of resource. We do not find those cases persuasive on that account. (We note that this distinction was not meaningful to the court in *Russell v. Johns Manville Co.,* 20 C.A.3d 405, 97 Cal.Rptr. 634 (1971).

from the laches of the lessee and the forfeiture of the lease allowed, where such forfeiture does not contravene plain and unambiguous stipulations in the lease.

11 L.R.A. (N.S.) 417.

It would be unjust, unreasonable, and countervene the nature and spirit of the lease, to allow the lessee to continue to hold his term for a considerable length of time, without making any effort to work the mine. Such a construction of the rights of the parties would enable him to prevent the lessor from getting his royalties under the express covenant to pay for the same, and deprive him of all opportunity to work the mine himself, or permit others to do so. The law does not tolerate such practical absurdity, nor will it permit the possibility of such injustice. It is of the essence of the lease, necessarily implied, that the lessee shall work the mine with reasonable diligence, or surrender the lease.

*George v. Jones,* 168 Neb. 149, 164, 95 N.W.2d 609, 617 (1959).

■ The law in this Commonwealth also finds an implied duty to mine. In *Aye v. Philadelphia Co.,* 193 Pa. 451, 44 A. 556 (1899), a lease provided that a test well would be drilled within six months "and if oil should be found in paying quantities to complete a well on the leased premises within the next six months or pay a yearly rental per acre for the delay." *Aye,* supra, 193 Pa. at 455, 44 A. 556. A test well was drilled, but was dry. The court found an implied duty to drill other test wells. *Aye* is not, of course, totally on point with the instant case. It does stand, however, for a predilection in this Commonwealth which favors development and the consequent implied duty to mine. Together with *Lehigh,* supra, *Aye* persuades us that our holding today is but an application of settled doctrine to a slightly different factual context.

Judgment reversed and remanded to the trial court for entry of judgment in favor of appellants.

HESTER, J., files a concurring statement.

HESTER, Judge, concurring:

I concur in the result reached by the majority. I am of the opinion that the lease terminated after the passage of five years.